(261 P.3d 558)
No. 104,740

In the Matter of BABY GIRL B., d/o/b: 2/3/10, A Minor Child.

Opinion filed July 8, 2011.

*Joseph W. Booth*, of Lenexa, for appellant natural father.

*Martin W. Bauer* and *Teresa L. Adams*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellees natural mother and Adoption Choices of Kansas, Inc.

Before BUSER, P.J., MALONE and STANDRIDGE, JJ.

BUSER, J.: Curtis, the natural father of Baby Girl B., appeals from the trial court's termination of his parental rights. The trial court terminated Curtis' parental rights based on two statutory grounds. First, the trial court found that Curtis "after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth" under K.S.A. 2009 Supp. 59-2136(h)(1)(D). Second, the trial court found that Curtis "abandoned the mother after having knowledge of the pregnancy" under K.S.A. 2009 Supp. 59-2136(h)(1)(E).

We conclude the trial court erred in its interpretation and application of K.S.A. 2009 Supp. 59-2136(h)(1)(D) and (E). Additionally, our review of the record convinces us the trial court's findings are not supported by clear and convincing evidence. Accordingly, we reverse the termination of Curtis' parental rights and remand the case to the district court with directions to conduct further proceedings to determine the custody issues involving Baby Girl B.

## FACTUAL AND PROCEDURAL BACKGROUND

Curtis M. (Curtis) is the baby's natural father. Racheal B. (Racheal) is Baby Girl B.'s birth mother. From January 2009 through May 2009, Curtis and Racheal had an intimate sexual relationship. Racheal terminated the relationship in June 2009 because she could not trust Curtis. Curtis and Racheal did not actually see each other after July 7, 2009. They were never married to one another.

In June or July 2009, Racheal told Curtis that she might be pregnant. Racheal testified that she told Curtis she had missed a menstrual period, but she did not know if that was due to the stress of a pending divorce. Racheal told Curtis that during a prior pregnancy she did not gain weight and she believed she had "mono." Curtis testified that he told Racheal to visit a doctor so they could find out if she was pregnant.

Curtis and Racheal talked on the phone once in August 2009 and once in September 2009. Although on both occasions they talked about a personal meeting, no meeting ever occurred. During both of these phone conversations, the topic of Racheal's possible pregnancy was never mentioned.

In October 2009, Racheal divorced her husband. During the divorce proceedings, Racheal signed a divorce decree indicating she was not pregnant because, according to her testimony, in October 2009, she did not believe she was pregnant.

In November 2009, Curtis called Racheal about visiting her, but no visit occurred. Once again, the topic of Racheal's possible pregnancy was not mentioned.

On December 12, 2009, Curtis and Racheal had two long phone conversations. The first phone call occurred at 11:13 a.m. and

lasted 79 minutes. The second phone call occurred at 7:44 p.m. and lasted 89 minutes. The content of the two phone calls was controverted.

In his memorandum decision, the trial judge discussed the phone calls. First, the trial court summarized the content of the phone calls based on Curtis' testimony: "According to [Curtis], [Racheal] told [Curtis] that she might be pregnant. [Curtis] then told [Racheal] to get a pregnancy test, but [Racheal] did not mention having used a home pregnancy test. [Curtis] did ask if he could be a possible father to which [Racheal] responded yes."

The trial court also summarized the content of the conversations based on Racheal's testimony:

"[Racheal] testified that on December 12, 2009 she was 100% sure she was pregnant. . . . [Curtis] told her to get a test. [Racheal] testified that she did get a test and in a second call that evening she told [Curtis] that she had taken the home pregnancy test and it was positive. [Curtis'] response was 'aren't you supposed to take those in the morning[?]' [Curtis] told [Racheal] that he would be home for the holidays and would see her then."

Importantly, the trial court did not resolve the critical issue raised by the contradictory versions of the two phone conversations: Did Racheal tell Curtis she was pregnant or that she might be pregnant?

From July to December 2009, Racheal did not miss her period. On January 13, 2010, Racheal had a blood test at a doctor's office. The doctor concluded that Racheal was only about 8 weeks pregnant. On January 26, 2010, and January 31, 2010, Racheal and Curtis exchanged text messages, but there was no mention of Racheal's pregnancy.

Racheal was scheduled for an appointment for prenatal care on February 3, 2010; however, on that date Baby Girl B. was born. Although he was able, it is uncontroverted that in the 6 months prior to Baby Girl B.'s birth, Curtis did not provide financial or emotional support to Racheal during her pregnancy.

Curtis learned of his daughter's birth from Racheal within a day or two. Racheal advised Curtis that she was considering adoption. Curtis initially agreed to the adoption but later requested a DNA test to confirm that he was, in fact, the father of Baby Girl B. On

February 11, 2010, Racheal and Adoption Choices of Kansas, Inc., petitioned the trial court to terminate Curtis' parental rights to Baby Girl B. in order to provide for the baby's adoption. Curtis received DNA confirmation that he was the natural father of the baby on February 23, 2010. He filed a child in need of care petition the next day, seeking the care, custody, and control of Baby Girl B. The following month, Curtis started a savings account for the baby but did not provide any support to Racheal or the custodial family. On March 15, 2010, Curtis also filed a paternity action requesting custody of Baby Girl B. and parenting time.

An evidentiary hearing on the related matters was held on May 5, 2010. A memorandum decision was filed on June 24, 2010. As discussed more fully below, the trial court terminated Curtis' parental rights for two statutory reasons. First, the trial court found that Curtis "after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth" under K.S.A. 2009 Supp. 59-2136(h)(1)(D). Second, the trial court found that Curtis "abandoned the mother after having knowledge of the pregnancy" under K.S.A. 2009 Supp. 59-2136(h)(1)(E). Finally, the trial court considered the best interests of Baby Girl B. and reaffirmed the termination decision.

Curtis filed a timely appeal.

### TERMINATION OF CURTIS' PARENTAL RIGHTS

Recently, our Supreme Court filed an important opinion regarding the termination of a natural father's parental rights. See *In re Adoption of Baby Girl P.*, 291 Kan. 424, 242 P.3d 1168 (2010). In that opinion, the Supreme Court set forth the standard of review and general legal principles relevant to termination of parental rights cases:

"Natural parents who have assumed their parental responsibilities have a fundamental right, protected by the United States Constitution and the Kansas Constitution, to raise their children. K.S.A. 2009 Supp. 59-2136(d) expresses Kansas' public policy that the best interests of children are served by fostering their relationships with their natural parents in cases where the parents have assumed parental duties toward their children. *In re Adoption of G.L.V.*, 286 Kan. 1034, 1057-58, 190 P.3d 245 (2008).

"We strictly construe adoption statutes in favor of maintaining the rights of natural parents in those cases where it is claimed that, by reason of a parent's failure to fulfill parental obligations as prescribed by statute, consent to the adoption is not required. *Adoption of G.L.V.*, 286 Kan. 1034, Syl. ¶ 6. A natural parent's right to raise his or her child is tempered by the extent to which the parent has assumed his or her parental responsibilities. When a natural father has assumed a sufficient level of parental responsibility under Kansas law, his parental rights are entitled to constitutional protection. *Adoption of G.L.V.*, 286 Kan. at 1061-62.

"A petitioner in an adoption proceeding, under K.S.A. 2009 Supp. 59-2136, has the burden of proving by clear and convincing evidence that termination of parental rights is appropriate. *In re Adoption of B.B.M.*, 290 Kan. 236, 243, 224 P.3d 1168 (2010). A court is to consider all of the relevant surrounding circumstances in an action based on K.S.A. 2009 Supp. 59-2136(h)(1)(D). Poverty alone is an insufficient basis for termination under that provision. *Adoption of B.B.M.*, 290 Kan. at 245.

"Appellate courts will uphold termination of parental rights if, after reviewing all the evidence in the light most favorable to the prevailing party, they deem the district court's findings of fact to be highly probable, *i.e.*, supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine factual questions. *Adoption of B.B.M.*, 290 Kan. at 244.

"A determination of whether to terminate paternal rights incident to an adoption is subject to K.S.A. 2009 Supp. 59-2136. K.S.A. 2009 Supp. 59-2136(h)(1) allows a district court to terminate parental rights upon finding by clear and convincing evidence any of the following factors:

'(A) The father abandoned or neglected the child after having knowledge of the child's birth;

'(B) the father is unfit as a parent or incapable of giving consent;

'(C) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;

'(D) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;

'(E) the father abandoned the mother after having knowledge of the pregnancy;

'(F) the birth of the child was the result of rape of the mother; or

'(G) the father has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition.'

"K.S.A. 2009 Supp. 59-2136(h)(2) further provides that, when making such a determination, the district court may consider and weigh the best interest of the child and may disregard incidental visitations, contacts, communications, or contributions." *In re Adoption of Baby Girl P.*, 291 Kan. at 430-31.

In applying the law to the facts of the present case, we first review the trial court's termination of Curtis' parental rights because after having knowledge of Racheal's pregnancy, he "failed without reasonable cause to provide support for the mother during the six months prior to the child's birth." K.S.A. 2009 Supp. 59-2136(h)(1)(D).

At the outset, Curtis does not contest the trial court's factual finding that "[Curtis] did not provide any financial or emotional support to [Racheal] from July, 2009 through February 3, 2010"— more than 6 months prior to the birth of Baby Girl B. Curtis readily concedes he did not provide support to Racheal during the 6 months preceeding the baby's birth. Curtis contends he did not provide any support because he did not have knowledge of Racheal's pregnancy.

Curtis' primary claim on appeal is that the trial court erred when it found he did not "seek out the existence of the pregnancy to preserve his rights." In other words, Curtis contends the trial court misread K.S.A. 2009 Supp. 59-2136(h)(1)(D) to require that, with knowledge of Racheal's *possible* pregnancy, he needed to investigate or confirm the pregnancy in order to preserve his parental rights.

On the other hand, Racheal argues:

"The only representations [Racheal] made about the pregnancy were the three times she told him she thought she was, or in fact, confirmed she was, pregnant and [Curtis] could be the father. When [Racheal] confirmed the pregnancy during the second December phone conversation, [Curtis] did not change his conduct or take any action. [Curtis'] passive conduct, in simply assuming [Racheal] was not pregnant, never inquiring about [Racheal's] condition, and never coming to see [Racheal] so that they could take a pregnancy test together, does not fulfill his 'active obligation' to exercise 'reasonable diligence' to find out her condition."

The undisputed facts established only three instances prior to Baby Girl B.'s birth where Racheal and Curtis mentioned the topic of pregnancy. The first occasion was in June or July 2009. According to the trial court, although Racheal told Curtis "that she missed her period and that she *might be pregnant,* it is clear that *even [Racheal] did not believe she was pregnant at that time.*" (Emphasis

added.) In fact, according to the trial court, Racheal's belief that she was not pregnant continued until at least October 2009.

The second and third occasions where the subject of pregnancy was mentioned were during two lengthy phone conversations on December 12, 2009. As set forth earlier, Curtis claimed that Racheal once again merely mentioned a possible pregnancy, while Racheal testified that in the second conversation she informed Curtis that, based on the results of a home pregnancy test taken that day, she was, in fact, pregnant. The trial court did not resolve these contradictory factual claims regarding whether Curtis was informed that Racheal was, in fact, pregnant at that time.

Although the trial court stated that its termination decision was based on a finding that Curtis had knowledge of Racheal's pregnancy, our reading of the trial court's memorandum decision convinces us the trial court reached that conclusion based on Curtis' failure to investigate Racheal's *possible* pregnancy and his failure to verify that she was, in fact, pregnant:

"What steps did [Curtis] avail himself of to determine whether [Racheal] was pregnant? Armed with the information [Racheal] might possibly be pregnant, [Curtis], with the chance to possibly verify for himself the pregnancy during his stay in Leavenworth from December 24-28, 2009, did nothing. . . . [Curtis] did not make the effort to find out, but simply sat back and said get a pregnancy test. . . . [Curtis] did not avail himself of any of the opportunities to discover whether [Racheal] was pregnant and consequently his opportunity to assist [Racheal] with her pregnancy. . . . [T]he Petitioners have proven by clear and convincing evidence that there is no reasonable cause for . . . [Curtis'] failure to avail himself of his opportunities to discover or verify the pregnancy."

We conclude the trial court based its decision on a misreading of K.S.A. 2009 Supp. 59-2136(h)(1)(D).

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Unruh v. Purina Mills*, 289 Kan. 1185, 1193, 221 P.3d 1130 (2009). When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271-72, 202 P.3d 7 (2009).

K.S.A. 2009 Supp. 59-2136(h)(1)(D) allows the trial court to terminate parental rights when "after having knowledge of the pregnancy" the father "failed without reasonable cause to provide support for the mother during the six months prior to the child's birth." The plain language of the statute requires the father to have knowledge of the pregnancy before lack of support for the mother is a ground for termination of the father's rights.

In the present case, however, the trial court substituted the words "possible pregnancy" for the word "pregnancy" in the statute. The trial court then added to the statute the requirement that when pregnancy is possible, the father is obligated to discover or verify the pregnancy. This statutory interpretation is at odds with the plain meaning of K.S.A. 2009 Supp. 59-2136(h)(1)(D). It also judicially expands the statutory provisions to include a requirement that is not found in the statute.

The trial court's interpretation of the statute was based on *In re Adoption of A.A.T.*, 287 Kan. 590, 196 P.3d 1180 (2008), *cert. denied* 129 S. Ct. 2013 (2009). In that case, a natural father sought to set aside the adoption of his newborn child over 6 months after the adoption was finalized. The natural father, who did not assume parenting responsibilities during the pregnancy, asserted he should be excused because the birth mother, after informing the father of her pregnancy, lied and said she had terminated the pregnancy. After the baby's birth, the mother provided inaccurate and misleading information about the natural father to the hospital, the adoption agency, and the court. At the subsequent court proceeding, no father appeared, the natural father's rights were terminated, and the adoption was finalized. The district court refused to set aside the adoption as requested by the natural father. Our Supreme Court affirmed. 287 Kan. at 624-26, 629-30.

In the present case, the trial court cited *In re Adoption of A.A.T.* for its proposition that

"[i]n a newborn adoption, the father's opportunity to make a commitment to parenting must have been grasped during the pregnancy and in a prompt and timely manner as measured by the fleeting opportunity availed to the father under the circumstances of the case, in other words, within a short time after he dis-

covered or reasonably should have discovered that the mother was pregnant with his child." 287 Kan. at 610.

*In re Adoption of A.A.T.* is not applicable to this case. *In re Adoption of A.A.T.* involved the attempt of a father to nullify the adoption of his natural child. Because the father did not appear at the termination proceeding, K.S.A. 59-2136(g) applied, and the termination factors set forth in K.S.A. 59-2136(h) were not applicable. See K.S.A. 2009 Supp. 59-2136(g); *In re Adoption of Baby Girl P.*, 291 Kan. at 440-41 (Luckert, J., concurring). Moreover, because the natural father did not appear at the termination hearing or assert custody prior to the adoption, the parental preference doctrine did not apply.

As Justice Luckert stated in her concurring opinion in *In re Adoption of Baby Girl P.*:

"The decision and rationale of *Adoption of A.A.T.* should be limited to the legal question presented there: Whether a finalized adoption should be set aside because the natural father did not receive notice of the adoption proceeding. The reasoning and holding should not be extended to determinations of whether a natural father who appears before an adoption is finalized and asserts his parental rights should have those rights terminated." 291 Kan. at 442.

Moreover, we are not concerned here with a natural father's responsibilities in those parental termination cases where, after having knowledge of the pregnancy, the father receives information the pregnancy has ended before the birth of a child. See *In re Adoption of Baby Girl P.*, 291 Kan. at 432-36. The present case also does not relate to the circumstance where a man knows of a woman's pregnancy yet only knows he is one of several possible fathers. See *In re D.M.M.*, 24 Kan. App. 2d 783, 786-89, 955 P.2d 618 (1997).

Our focus in the present case is simply on the plain meaning of the statutory language which requires a father's knowledge of the pregnancy before the duty to support the mother arises. In this circumstance, the father must have knowledge of the pregnancy and the statute does not require the father to discover or verify a *possible* pregnancy.

We next address whether the petitioners have proven by clear and convincing evidence that termination of Curtis' parental rights

was appropriate. See *In re Adoption of B.B.M.*, 290 Kan. 236, 243, 224 P.3d 1168 (2010). As noted earlier, we will uphold termination of parental rights if, after reviewing all the evidence in the light most favorable to the prevailing party, we find the trial court's findings of fact to be highly probable, *i.e.*, supported by clear and convincing evidence. 290 Kan. at 244.

Although the trial court found the petitioners proved by clear and convincing evidence that Curtis had knowledge of Racheal's pregnancy but failed to support her during the 6 months prior to the baby's birth, we conclude there was insufficient clear and convincing evidence to show that Curtis knew of Racheal's pregnancy prior to the Baby Girl B.'s birth.

The trial court found that "[t]his case is unique in that [Racheal] was not aware with any certainty of her pregnancy until less than 2 months before the child was born." This finding is clearly supported by the evidence. And if Racheal was unaware she was pregnant less than 60 days before the birth, it follows that Curtis could not have known of the pregnancy as of that time.

The trial court, however, did not provide any factual basis to support the critical finding of whether, prior to the baby's birth, Curtis ever had knowledge of Racheal's pregnancy. In fact, our review of the entire record shows only one solitary instance—during the second December 12, 2009, telephone conversation—wherein, according to Racheal, she informed Curtis she was pregnant. Of course, Racheal's testimony was controverted by Curtis' testimony, and the trial court made no finding regarding which account was true. Still, Racheal's testimony is exceptional because the record is bereft of any other evidence, before or after December 12, 2009, that Curtis had knowledge of Racheal's pregnancy prior to the baby's birth. Moreover, during this 7-week time period, Racheal and Curtis had several contacts, yet neither one testified that the subject of Racheal's pregnancy was ever mentioned.

A court is to consider all of the relevant surrounding circumstances in an action based on K.S.A. 2009 Supp. 59-2136(h)(1)(D). See *In re Adoption of B.B.M.*, 290 Kan. at 245. Having carefully considered the relevant surrounding circumstances contained in the record evidence and the trial court's findings, we conclude

there was only scant uncorroborated evidence—not clear and convincing evidence—that Curtis knew of Racheal's pregnancy prior to Baby Girl B.'s birth. Accordingly, we hold the trial court's finding that Curtis, after having knowledge of the pregnancy, failed without reasonable cause to provide support for Racheal during the 6 months prior to the baby's birth is unsupported by clear and convincing evidence.

The trial court also found a second basis to terminate Curtis' parental rights to Baby Girl B. It ruled that Curtis "abandoned the mother after having knowledge of the pregnancy." See K.S.A. 2009 Supp. 59-2136(h)(1)(E); *In re Baby Boy N.*, 19 Kan. App. 2d 574, 874 P.2d 680, *rev. denied* 225 Kan. 1001, *cert. denied* 513 U.S. 1018 (1994).

As discussed earlier regarding K.S.A. 2009 Supp. 59-2136(h)(1)(D), we conclude the trial court also misread K.S.A. 2009 Supp. 59-2136(h)(1)(E) because it improperly equated the knowledge of pregnancy requirement in the statute with Curtis' knowledge of Racheal's possible pregnancy. Once again, the words of the statute are plain and clear. The trial court's conclusion that abandonment was proven because Curtis did not support Racheal after he knew of the possibility of Racheal's pregnancy but failed to discover and verify it was erroneous. Under these circumstances, Curtis' conduct did not constitute a basis to terminate his parental rights under K.S.A. 2009 Supp. 59-2136(h)(1)(E).

Although the trial court found the petitioners proved by clear and convincing evidence that Curtis abandoned Racheal after having knowledge of the pregnancy, the trial court did not make any specific factual findings in support of its determination. However, it was Racheal who terminated the relationship with Curtis in the summer of 2009, long before she realized she was pregnant. Moreover, as we concluded earlier, there was insufficient clear and convincing evidence to show that Curtis knew of Racheal's pregnancy prior to the baby's birth. Under these circumstances, we fail to find evidence of abandonment. Accordingly, we hold the trial court's finding that Curtis' parental rights also should be terminated under K.S.A. 2009 Supp. 59-2136(h)(1)(E) was unsupported by clear and convincing evidence.

We also note the trial court, after observing that both parties had an "equally compelling" basis to believe that it was in the best interests of Baby Girl B. to either terminate or not to terminate Curtis' parental rights, ultimately reaffirmed its decision to terminate his parental rights. As the trial court correctly observed, however, "[a] finding that the adoption is in the best interests of the minor child is not sufficient, in and of itself, to terminate the Father's rights," citing *In re Adoption of Baby Boy M.*, 40 Kan. App. 2d 551, 562, 193 P.3d 520 (2008). This is a correct statement of the law.

Finally, we are mindful of the very significant consequences our decision will have on all parties to this litigation. We are guided, however, by important legal precedent which was summarized by our Supreme Court: "When applying K.S.A. 59-2136(h), Kansas appellate courts have strongly endorsed the parental preference doctrine, required strict compliance, and diligently enforced the clear and convincing evidence standard." *In re Adoption of A.A.T.*, 287 Kan. at 625 (citing cases).

For all of these reasons, the termination of Curtis' parental rights to Baby Girl B. is reversed. The case is remanded to the district court for the purpose of conducting further proceedings to determine the custody issues involving Baby Girl B.

\* \* \*

MALONE, J., concurring: I concur with the result in this case and with the reasoning set forth in the majority opinion. I write separately to express my view that even if the district court had expressly found that Curtis gained knowledge of Racheal's pregnancy on December 12, 2009, it would still be my position in this case that the petitioners failed to demonstrate by clear and convincing evidence that Curtis' parental rights should be terminated under K.S.A. 2009 Supp. 59-2136(h)(1)(D) or (E).

The facts of this case are indeed unusual. We now know, after the fact, that Racheal must have become pregnant sometime around May 2009. But she did not gain much weight, and she did not miss her period until December 2009. In October 2009, Racheal divorced her husband and signed a divorce decree indicating

she was not pregnant because, according to her own testimony, she did not believe she was pregnant. Considering the evidence in the light most favorable to the petitioners, Curtis gained knowledge of the pregnancy on December 12, 2009. Racheal visited her doctor on January 13, 2010, and her doctor concluded from a blood test that she was about 8 weeks pregnant. Racheal was scheduled for a prenatal checkup on February 3, 2010, and on that date, apparently to everyone's surprise, she delivered Baby Girl B. full-term.

Curtis learned of the birth within a day or two, and he requested DNA testing to confirm paternity. Curtis received confirmation that he was the biological father on February 23, 2010. On the very next day, he filed a child in need of care petition seeking the care, custody, and control of Baby Girl B. On March 15, 2010, he filed a separate paternity action acknowledging paternity and requesting parenting time. Since then, Curtis has been engaged in a protracted legal battle with Adoption Choices of Kansas, Inc., over the custody of his daughter. After losing in district court, Curtis has taken his fight to the Kansas Court of Appeals.

Under K.S.A. 2009 Supp. 59-2136(h)(1), when a father appears to assert parental rights, the court may order that parental rights be terminated, upon a finding by clear and convincing evidence, of any of the following:

"(A) The father abandoned or neglected the child after having knowledge of the child's birth;

"(B) the father is unfit as a parent or incapable of giving consent;

"(C) the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth;

"(D) the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth;

"(E) the father abandoned the mother after having knowledge of the pregnancy;

"(F) the birth of the child was the result of rape of the mother; or

"(G) the father has failed or refused to assume the duties of a parent for two consecutive years next preceeding the filing of the petition."

This statute provides that a district court can terminate a father's parental rights upon finding by clear and convincing evidence any one of seven factors listed in the statute. Most of the factors involve the father abandoning or neglecting the child after having knowl-

edge of the child's birth, failing to provide support for the mother after having knowledge of the pregnancy, or failing to assume the duties of a parent for 2 consecutive years. The gist of the entire statute is that the district court can terminate the father's parental rights upon finding by clear and convincing evidence that the father has failed to step up to the plate to assume his parental responsibilities within a reasonable amount of time after learning about the responsibilities.

This cases focuses on K.S.A. 2009 Supp. 59-2136(h)(1)(D), which provides that the district court can terminate a father's parental rights upon finding by clear and convincing evidence that "the father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the mother during the six months prior to the child's birth." This subsection provides a somewhat arbitrary 6-month window of opportunity for the father to act responsibly and provide support for the mother prior to the child's birth. If the father fails to do so, he can lose his parental rights forever. The biggest problem with applying this statutory test to the case at hand is that at best, Curtis did not gain knowledge of Racheal's pregnancy until about 7 weeks before Baby Girl B. was born. And no one, including Racheal, knew on December 12, 2010, that Baby Girl B. was going to arrive within 7 weeks. Under the unique circumstances of this case, it becomes difficult to apply K.S.A. 2009 Supp. 59-2136(h)(1)(D) as an appropriate statutory test to determine whether Curtis' parental rights should be terminated.

I am not saying that K.S.A. 2009 Supp. 59-2136(h)(1)(D) is unconstitutional. Certain arbitrary time frames need to be drawn by the legislature in order to test parental fitness. Normally, 6 months is a sufficient amount of time for a father to act responsibly and provide support for the mother prior to the child's birth. And it possibly would not offend my sense of justice to terminate a father's parental rights if the evidence showed that he failed without reasonable cause to provide support for the mother after learning about the pregnancy 5 months, or even 4 months, prior to the child's birth. Each case must be judged on its own facts. But as the date the father gains knowledge of the pregnancy gets closer and

closer to the child's birth, the sufficiency of the evidence to terminate his parental rights on this ground becomes less and less convincing.

A court is "to consider all of the relevant surrounding circumstances in an action based on K.S.A. 2009 Supp. 59-2136(h)(1)(D)." *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430, 242 P.3d 1168 (2010). Here, it seems to me that the district court failed to consider all the relevant circumstances surrounding this case before terminating Curtis' parental rights. Racheal herself did not realize she was pregnant until a few weeks before giving birth, and the timing of the delivery came as a surprise to everyone. Curtis had very little time to provide any meaningful support to Racheal prior to the child's birth. Perhaps this fact can be considered as "reasonable cause" under the statute, thereby excusing Curtis' failure to provide support to Racheal. However the evidence is viewed, I conclude the petitioners failed to demonstrate by clear and convincing evidence that Curtis' parental rights should be terminated under K.S.A. 2009 Supp. 59-2136(h)(1)(D).

Likewise, there was no evidence that Curtis "abandoned" Racheal after having knowledge of the pregnancy in order to support termination of parental rights under K.S.A. 2009 Supp. 59-2136(h)(1)(E). The term "abandonment" is defined in family law as "[t]he act of leaving a spouse or child willfully and without an intent to return." Black's Law Dictionary 2 (9th ed. 2009). Racheal voluntarily terminated her relationship with Curtis in June 2009, and the couple did not see each other after July 7, 2009. Even if Curtis gained knowledge of the pregnancy in December 2009, he and Racheal already had separated several months prior to that date. Under the evidence presented, Curtis could not have possibly "abandoned" Racheal after having knowledge of the pregnancy.

My heart goes out to the prospective adoptive parents in this case who have been taking care of Baby Girl B. since her birth. However, "a natural parent who has assumed his or her parental responsibilities has a fundamental right, protected by the United States Constitution and the Kansas Constitution, to raise his or her child." *In re Adoption of G.L.V.*, 286 Kan. 1034, 1057, 190 P.3d 245 (2008). Curtis has assumed his parental responsibilities, and

he has been fighting to gain custody of his daughter since her birth. The petitioners have failed to prove by clear and convincing evidence that Curtis' parental rights should be terminated. The order terminating his parental rights must be set aside, and the case should be remanded to district court to resolve the custody issues between Racheal and Curtis in regards to Baby Girl B.

STANDRIDGE, J., joins in the foregoing concurring opinion.